UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

ERNEST NEWCOMBE,

Plaintiff,

v. 8:23-CV-0024 (GTS/DJS)

UNITED STATES OF AMERICA, by and through its employees, officers and/or agents,

Defendant.

---

| APPEARANCES: | OF COUNSEL: |
|---|---|
| BOTTAR LAW, PLLC<br>Counsel for Plaintiff<br>The Fairfield Estate<br>7078 E. Genesee Street<br>Fayetteville, NY 13066 | MICHAEL A. BOTTAR, ESQ. |
| 1300 AXA Tower II<br>120 Madison Street<br>Syracuse, NY 13202 | SAMANTHA C. RIGGI, ESQ. |
| OFFICE OF THE UNITED STATES ATTORNEY<br>NORTHERN DISTRICT OF NEW YORK<br>Counsel for Defendant<br>P.O. Box 7198<br>100 South Clinton Street<br>Syracuse, NY 13261-7198 | RANSOM P. REYNOLDS III, ESQ.<br>Assistant U.S. Attorney |

GLENN T. SUDDABY, United States District Judge

# DECISION and ORDER

Currently before the Court, in this Federal Tort Claims Act ("FTCA") action filed by Ernest Newcombe ("Plaintiff") against the United States of America ("Defendant"), are the following two motions: (1) Defendant's combined motion to exclude Plaintiff's expert pursuant

to Fed. R. Civ. P. 702 and for summary judgment pursuant to Fed. R. Civ. P. 56; and (2) Plaintiff's motion to exclude Defendant's expert pursuant to Fed. R. Civ. P. 702. (Dkt. Nos. 40, 47.) For the reasons set forth below, Defendant's motions are denied and Plaintiff's motion is denied.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint[1]

Generally, in his Amended Complaint, Plaintiff asserts that Defendant, through medical providers Family Nurse Practitioner Christine Couperus-Mashewske and Nurse Practitioner Ernie Cougler at Community Health Center of the North Country ("CHCNC") (which is a federally supported health center eligible for medical malpractice coverage under the FTCA), provided him negligent medical care by failing to identify and treat a blood infection caused by bacterial endocarditis that ultimately resulted in damage to the mitral valve of his heart, which required surgical replacement of that valve. (*See generally* Dkt. No. 10.)

### B. Undisputed Material Facts on Defendant's Motion for Summary Judgment

Under N.D.N.Y. Local Rule 56.1, a party opposing summary judgment must file a response to the moving party's Statement of Material Facts that "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs," supported by "a specific citation to the record where the factual issue arises." N.D.N.Y. L.R. 56.1(b). This requirement is not a mere formality; rather "this and other local rules governing summary judgment are

[1] Plaintiff initially filed the Complaint in this matter on January 9, 2023. (Dkt. No. 1.) Before any responsive pleadings or motions were filed, Plaintiff filed the Amended Complaint on March 21, 2023. (Dkt. No. 10.)

essential tools intended to relieve the district court of the onerous task of hunting through voluminous records without guidance from the parties." *LaFever v. Clarke*, 17-CV-1206, 2021 WL 921688, at *6 (N.D.N.Y. Mar. 11, 2021) (Hurd, J.) (quoting *Frantti v. New York*, 414 F. Supp. 3d 257, 284 [N.D.N.Y. 2019] [Hurd, J.]). Indeed, "[a] proper response to a movant's statement of material facts streamlines the summary judgment analysis 'by allocating responsibility for flagging genuine factual disputes on the participants ostensibly in the best position to do so: the litigants themselves.'" *LaFever*, 2021 WL 921688, at *7 (quoting *Alke v. Adams*, 16-CV-0845, 2018 WL 5297809, at *2 [N.D.N.Y. Oct. 25, 2018] [Hurd, J.]). "The Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y. L.R. 56.1(b).

Applying this legal standard here, the following facts have been asserted and supported by record citations by Defendant, and either expressly admitted or denied without a supporting record citation by Plaintiff.

1. Plaintiff had been receiving primary care treatment from CHCNC since at least 2016.

<u>Visit to Gouverneur Hospital Emergency Department on January 19, 2020</u>

2. On January 19, 2020, Plaintiff presented to Gouverneur Hospital Emergency Department ("GHED") with a fever and was treated by Physician Assistant Michelle Kent.

3. During that visit, PA Kent ordered a blood sample to check for a blood infection.[2]

4. Plaintiff was diagnosed with pneumonia and discharged with a prescription for

---

2 The Court agrees with Plaintiff that the evidence relied upon by Defendant does not support the contention that PA Kent ordered this test "immediately." The relevant records show that he was seen by a PA Kent at 17:15, but that a blood culture test was not ordered until 19:00. (Dkt. No. 41, Attach. 1, at 23, 25.)

the antibiotic Levaquin.

5. On January 21, 2020, GHED called CHCNC and notified them that Plaintiff's preliminary blood cultures showed a strep species.

6. On January 22, 2020, GHED received Plaintiff's final blood culture results, which were positive for streptococcus sanguinis.

7. GHED physician Dr. Ismene Maravegias received and reviewed the final blood culture results on that same date.

8. GHED notified CHCNC that these results showed a positive culture.[3]

9. On January 23, 2020, Plaintiff was seen for a follow-up appointment by FNP Couperus-Mashewske at CHCNC after he was diagnosed with pneumonia and discharged by GHED.[4]

---

[3] There seems to be no dispute that CHCNC was notified that the final results showed a positive culture, as that is directly stated in evidence cited by Plaintiff. There is however a question of fact as to whether CHCNC (and in particular FNP Couperus-Mashewske) was specifically made aware that the strain involved was streptococcus sanguinis. The evidence is not clear on this point, but FNP Couperus-Mashewske testified at her deposition that "somewhere in there [around January 22nd], it looks like the labs came to the office, and I gave a copy to him," as well as that she reviewed those labs (which would have consisted of the blood cultures) at the follow-up appointment with Plaintiff on January 23, 2020. (Dkt. No. 47, Attach. 8, at 33, 40.) What is not evident is what specific information those labs contained, i.e., whether they included a specification of the strain of infection involved or merely showed a positive result signifying the presence of an infection. As a result, although there is no dispute that FNP Couperus-Mashewske was aware that the blood culture results were positive for a strep species, there is a genuine dispute of fact regarding what specific information she possessed about the relevant strain of bacteria as of January 23, 2020.

[4] Plaintiff disputes the portion of this fact related to what the follow-up was for (asserting that CHCNC's treatment notes show it was for "strep follow up from ER"), but his objection is not responsive to the fact asserted. The asserted fact does not address what CHCNC assessed as the reason for the follow-up, but rather that (a) a follow-up appointment occurred, and (b) that he had been diagnosed with pneumonia before being discharged by GHED. Plaintiff notably does not dispute that Plaintiff was indeed diagnosed with pneumonia by GHED. Because Plaintiff has not actually disputed any portion of the asserted fact, the asserted fact is deemed to be

10. The final results of the blood culture were sent to GHED because it was their physicians that ordered that culture.

Visit to Gouverneur Hospital Emergency Department on January 28, 2020

11. On January 28, 2020, Plaintiff again presented to GHED with a fever and was treated by PA Corcoran.

12. The documentation from this visit noted that Plaintiff's blood cultures from January 19, 2020, were positive for streptococcus sanguinis.

13. PA Corcoran ordered repeat blood cultures.

14. PA Corcoran also prescribed Plaintiff a six-day dose of Levaquin.

15. Plaintiff was advised to "return to the ED if fever recurs."

16. Plaintiff was discharged with a clinical impression of "febrile illness, viral illness."

17. On January 30, 2020, GHED physician Dr. Maravegias received the final blood culture results from Plaintiff's blood draw on January 28, 2020, which had shown "[g]ram-positive cocci in chains which grew out to be Streptococcus sanguinous which showed a sensitivity to levofloxacin."

Visit to CHCNC on January 30, 2020

18. On January 30, 2020, Plaintiff presented to CHCNC for a follow-up appointment after his recent discharge from GHED.

19. CHCNC's interpretation and FNP Couperus-Mashewske's understanding at that time was that Plaintiff had tested positive for strep throat at GHED and that he had been

---

admitted.

prescribed an antibiotic.[5]

20. Plaintiff's vital signs were normal.

21. FNP Couperus-Mashewske did not order repeat blood cultures.[6]

22. FNP Couperus-Mashewske recommended a referral to an ENT if further strep infections occurred.

23. Between January and July 2020, NP Cougler was employed at both GHED and CHCNC, and he treated Plaintiff at both locations.

24. On February 1, 2020, NP Cougler created an addendum note in the treatment record for GHED documenting that Plaintiff's blood culture final results from January 28, 2020, were positive for streptococcus sanguinis.

Visit to CHCNC on February 11, 2020

25. On February 11, 2020, Plaintiff was seen again at CHCNC by FNP Couperus-Mashewske for respiratory symptoms, cold chills, coughing, nose running, vomiting due to coughing, fever, and right ear pain.

---

5 The Court agrees with Plaintiff that there is nothing in the cited evidence that specifically states that it was Plaintiff who reported to FNP Couperus-Mashewske that he had tested positive for strep throat at GHED, and has therefore altered the asserted fact to better reflect the content of the cited evidence (which Plaintiff has not otherwise disputed).

6 This portion of the asserted fact is undisputed. The Court finds however that the remainder of the asserted fact is properly disputed and therefore has been omitted from this statement of undisputed material facts. Based on the evidence presented, which includes FNP Couperus-Mashewske's deposition testimony that she did not know of any blood cultures performed by GHED other than the first cultures from the GHED visit on January 19, 2020 (Dkt. No. 40, Attach. 8, at 7) and evidence showing that at least preliminary results from January 30, 2020, showing gram positive cocci in chains were sent by fax machine to FNP Couperus-Mashewske (Dkt. No. 45, Attach. 1, at 100, 119), there is a genuine dispute of fact regarding whether FNP Couperus-Mashewske was aware of the second blood culture results.

26. FNP Couperus-Mashewske prescribed Plaintiff amoxicillin and prednisone.

27. FNP Couperus-Mashewske did not order repeat blood cultures.[7]

28. CHCNC did not receive the final blood culture results or the species of the bacteria from the blood draw of January 28, 2020.[8]

Visit to CHCNC on April 1, 2020

29. On April 1, 2020, Plaintiff was seen at CHCNC by NP Cougler for low back pain and kidney stones.

30. At this appointment, Plaintiff neither had a fever nor complained of fever-like symptoms.[9]

Call to CHCNC and Visit to GHED on April 13, 2020

31. On April 13, 2020, Plaintiff called CHCNC complaining of painful urination, sweating, and low back pain.

---

[7] The rest of the asserted fact is omitted here for the same reasons discussed in Note 6 of this Decision and Order: the evidence shows that there is a genuine dispute of material fact as to whether FNP Couperus-Mashewkse was aware that a more recent blood culture had been performed on January 28, 2020, that was positive for the presence of bacteria.

[8] Plaintiff disputes this asserted fact but the only evidence he cites in support of that denial is related to receipt of the *preliminary* blood culture results, which do not appear to state the type of bacteria involved other than that there was a "gram positive cocci in chains" and that the aerobic and anaerobic bottles were positive. (Dkt. No. 45, Attach. 1, at 119.) Because there appears to be no evidence presented that the *final* results were given to CHCNC, this asserted fact is deemed admitted.

[9] Plaintiff disputes that he did not complain of fever-like symptoms given that his blood pressure was noted to be elevated at 142/70. (Dkt. No. 47, Attach. 14, at ¶ 32.) Although it is true that his blood pressure was noted to be 142/70 at this visit, there is nothing in the treatment record that suggests this is indicative of the presence of an infection, especially given that Plaintiff's temperature was assessed as 97.3 degrees and his heart rate was noted to be 78 (neither of which had been flagged by NP Cougler as abnormal). (Dkt. No. 41, Attach. 2, at 5.) Plaintiff's assertion that high blood pressure is a "fever-like symptom" is entirely speculative and without an evidentiary basis. Defendant's asserted fact is therefore deemed admitted.

32. NP Cougler advised Plaintiff to go to the emergency room.

33. Plaintiff presented to GHED with back pain, chills, and sweating.

34. Plaintiff was diagnosed with hematuria, hyperglycemia, and a non-obstructing calculus in the right kidney.

35. Plaintiff was instructed to return to GHED if his symptoms persisted or worsened.

Visits to Gouverneur Hospital Emergency Department on May 28 and 30, 2020

36. On May 28, 2020, Plaintiff presented to GHED with extreme low back pain and no fever.

37. Plaintiff was diagnosed at that time with a kidney stone in his right kidney.

38. Plaintiff was instructed to return to GHED if his symptoms persisted or worsened.

39. On May 30, 2020, Plaintiff was transported by ambulance to GHED with excruciating back pain.

40. At that time, NP Cougler diagnosed Plaintiff with lumbar radiculopathy.

Visit to CHCNC on June 5, 2020, and Phone Call on June 25, 2020

41. On June 5, 2020, Plaintiff was seen at CHCNC by NP Cougler for a follow-up appointment related to his kidney stone and for continued pain.

42. On June 25, 2020, Plaintiff called CHCNC to report red spots on his legs and LPN Paul Millerschin returned his call and left a message for Plaintiff to call back as needed to discuss his current symptoms.[10]

Visit to CHCNC on July 1, 2020, and Related Developments

43. On July 1, 2020, Plaintiff was seen at CHCNC by NP Cougler, presenting with

[10] The Court agrees with Plaintiff that the cited evidence shows that LPN Millerschin, not NP Cougler, returned Plaintiff's call. (Dkt. No. 41, Attach. 2, at 22.)

complaints of rash spots on his legs and chills.

44. Lab tests were ordered.

45. NP Cougler called Plaintiff later that same day to notify him that there had been a significant drop in his hemoglobin and hematocrit levels.

46. NP Cougler submitted an urgent referral to gastroenterology.[11]

47. On July 9, 2020, NP Cougler (in his capacity at CHCNC) contacted Plaintiff and instructed him to go to Canton Potsdam Hospital for further workup and a possible blood transfusion.

48. That same day, Plaintiff was diagnosed at Canton Potsdam Hospital with bacterial endocarditis, flail mitral valve, acute renal failure, low back pain, and anemia.

49. On July 10, 2020, Plaintiff was transferred to St. Joseph's Hospital Health Center in Syracuse for bacterial endocarditis and underwent mitral valve replacement surgery.

Dr. Charash – Plaintiff's Expert

50. Dr. Charash is board certified in cardiology and was not asked by Plaintiff to opine regarding the standard of care for the treatment of Plaintiff's streptococcus sanguinis by GHED.

51. Dr. Charash did not offer an opinion regarding what a hospital or emergency room should or should not do under the circumstances presented in this case.[12]

---

[11] Plaintiff appears to dispute the use of the word "urgent," but the cited evidence specifically states "patient contacted and urgent referral sent to GI." (Dkt. No. 41, Attach. 1, at 21.) This asserted fact is therefore deemed admitted.

[12] The Court agrees with Plaintiff that Defendant's characterization that Dr. Charash "did not have an opinion" about GHED's standard of care is not wholly consistent with the cited evidence, in which Dr. Charash testifies that he is "not going to talk about what an ER should or should not do in this case." (Dkt. No. 40, Attach. 2, at ¶ 53; Dkt. No. 40, Attach. 10, at 8; *see*

52. Dr. Charash is not board certified in infectious disease or emergency medicine.[13]

53. Dr. Charash does not practice emergency medicine, does not practice as an emergency department physician, and is not a hospitalist.

54. Dr. Charash testified that he would have to consult with an infectious disease physician regarding whether endocarditis could be treated with just oral antibiotics as opposed to IV antibiotics.[14]

55. Dr. Charash testified that "[l]ike any blood culture finding, [strep sanguinis] is usually beyond the ability of a primary care provider to effectively manage and treat it by themselves."[15]

---

*also* Dkt. No. 40, Attach. 10, at 10 [Plaintiff's counsel noting at Dr. Charash's deposition that "[t]his expert has already stated many times he's not been retained to offer opinions about the care from the emergency department"].)

[13] While Plaintiff's point that no board certification in infectious diseases exists is well taken, his attempt to add other facts beyond the scope of the asserted fact does not otherwise dispute what is stated in the asserted fact. The Court also notes that, although Dr. Charash is indisputably board certified in internal medicine and infectious disease is a subspecialty in internal medicine, that fact does not somehow lead to a reasonable inference that Dr. Charash has any specialty in infectious disease specifically; to the contrary, he testified at his deposition that he would not know whether the relevant infection involved in this case could be treated with oral antibiotics alone and that generally a primary care physician would call an infectious disease consultant or the emergency room to handle such an infection. (Dkt. No. 40, Attach. 10, at 5-6.)

[14] Plaintiff is correct that the cited evidence does not support Defendant's asserted fact that Dr. Charash would need to consult an infectious disease physician regarding how to treat endocarditis. The cited portion of Dr. Charash's deposition testimony only discusses that he would need to make such consult to ascertain whether oral Lavaquin would be sufficient in place of treatment with IV antibiotics, with him stating that "99 percent of the time, if not a 100, we give IV antibiotics." (Dkt. No. 47, Attach. 9, at 55.) Indeed, this testimony suggests that Dr. Charash was aware of how the relevant infection is typically treated, i.e., with IV antibiotics. Because both parties have cited to this portion of the deposition testimony, the Court has altered the above fact to more accurately reflect what that testimony states.

[15] Again, the Court agrees with Plaintiff that Defendant has not accurately characterized the cited testimony of Dr. Charash in its asserted fact and so has altered the asserted fact to better

56. Dr. Charash testified that a positive blood culture is considered critical for most hospitals.

57. Dr. Charash testified that a lab must immediately notify the ordering doctor of positive blood culture results.

58. Dr. Charash is not an expert on hospital protocols regarding blood culture results.

59. Dr. Charash does not know what the sepsis protocol was at GHED in January 2020.

60. Dr. Charash opined that the standard of care required CHCNC to determine the source of the blood infection, order repeat blood cultures to determine if bacteria remained in the blood, and develop a treatment plan.

<u>Dr. Hostetler – Defendant's Expert</u>

61. Dr. Hostetler is board certified in internal medicine with a subspecialty in infectious diseases.

62. Dr. Hostetler is an infectious disease consultant and spends approximately 80% of his time in hospitals.

63. Dr. Hostetler consults with and provides guidance to hospitals and emergency department physicians.

64. Dr. Hostetler has worked at several hospitals and has managed sepsis protocols.

65. Dr. Hostetler is familiar with how positive blood cultures are managed in hospitals based on his experience as an infectious disease consultant.

66. Dr. Hostetler opined that a primary care office is not the place where positive

---

reflect that testimony.

blood cultures should be managed.

**C. Parties' Arguments on Defendant's Motion for Summary Judgment**

**1. Defendant's Memorandum of Law**

Generally, in its motion, Defendant makes four arguments. (Dkt. No. 40, Attach. 1.) First, Defendant argues that the opinion and testimony of Plaintiff's expert, Dr. Charash, should be excluded because he is not qualified to opine on the relevant standard of care applicable to Plaintiff's medical malpractice claim. (*Id.* at 16-20.) Specifically, Defendant argues that Dr. Charash – a cardiologist who does not practice in emergency medicine or as a hospitalist – lacks the expertise in infectious disease management to render opinions regarding the diagnosis and management of bacteremia, the interpretation and follow-up of positive blood cultures, and the allocation of responsibility between emergency medicine providers, hospital care providers, and primary care providers related to the treatment of that condition. (*Id.*)

Second, Defendant argues that, even if Dr. Charash was qualified to offer an opinion on the standard of care, his opinions are nevertheless unsupported by the undisputed facts which show that CHCNC never received the final blood culture results from GHED, and also misstate the applicable standard of care by (a) imposing a duty on a physician who lacked access to critical diagnostic information (i.e., the final blood culture results), (b) ignoring GHED's non-delegable duty to act on test results it orders and receives, and (c) providing a standard that conflicts with the acknowledged standard requiring hospital-based management of bacteremia. (*Id.* at 20-21.)

Third, Defendant argues that the decision in *Lind v. United States*, 20-CV-0574, 2024 WL 1345339 (N.D.N.Y. Mar. 29, 2024) (which also involved a challenge to Dr. Charash's

expert opinions) does not suggest that summary judgment should be denied because the material facts here are undisputed, the challenges to Dr. Charash opinions in *Lund* went to the weight, rather than the admissibility, of those opinions, and Dr. Charash's opinions in this case are inconsistent with his own deposition testimony. (*Id.* at 21-23.)

Fourth, Defendant argues that summary judgment should be granted in its favor because, once Dr. Charash's opinions are properly excluded, there is no admissible medical expert testimony to support Plaintiff's medical malpractice claim as required by New York law, and because Defendant's expert has opined that CHCNC complied with the applicable standard of care. (*Id.* at 23-24.)

**2. Plaintiff's Opposition Memorandum of Law and Motion to Exclude Expert Testimony**

Generally, in his combined opposition to Defendant's motion and motion to exclude Defendant's expert opinion, Plaintiff makes three arguments. (Dkt. No. 47, Attach. 13.) First, Plaintiff argues that the opinions of Defendant's expert, Dr. Hostetler, should be excluded because Dr. Hostetler is not qualified to render an opinion regarding the applicable standard of care for either primary care providers or emergency medicine providers. (*Id.* at 16-21.) Specifically, Plaintiff argues that Dr. Hostetler is not qualified to opine regarding the standard of care in a primary care setting because, although he practices in infectious disease management, he does not have experience providing primary care services, and he has shown his lack of expertise and understanding by testifying at his deposition that there is no standard of care applicable to CHCNC in this case. (*Id.*) Additionally, Plaintiff argues, to the extent that it is even relevant, that Dr. Hostetler is also unqualified to opine regarding the standard of care for emergency department management of blood cultures after a patient has been discharged because

he also has no experience working in an emergency department. (*Id.*)

Second, Plaintiff argues that Dr. Hostetler's opinions should be excluded based on the lack of a proper foundation because, in rendering his opinions, he ignores critical evidence related to CHCNC's receipt and knowledge of the final blood culture results from January 23, 2020, and improperly concludes that documentation related to a heart murmur on June 20, 2020, was a charting error without any basis for doing so. (*Id.* at 21-23.)

Third, Plaintiff argues that Dr. Charash is qualified to opine regarding the applicable standard of care because (a) he is board certified in both internal medicine and cardiovascular disease and practices as a primary care physician for approximately half of his patients, and (b) his lack of experience in emergency medicine is irrelevant because the only entity sued in this case (CHCNC through the United States) is a primary care provider. (*Id.* at 24-28.) Plaintiff additionally argues that, contrary to Defendant's argument, this case should be decided in the same manner as *Lind* because there exist genuine disputed issues of fact related to CHCNC's treatment of Plaintiff as well as a dispute related to the applicable standard of care, and Dr. Charash is qualified to testify as to those issues. (*Id.*)

**3. Defendant's Reply Memorandum of Law and Opposition to Plaintiff's Motion**

Generally, in reply, Defendant makes four arguments. (Dkt. No. 50.) First, Defendant argues that Plaintiff's response to its statement of material facts is improper and should be disregarded because Plaintiff attempts to inject legal and factual arguments into those responses, attempts to recharacterize facts to suit his own narrative, and fails to cite record evidence to support his denials. (*Id.* at 5-10.) Defendant additionally argues that Plaintiff has improperly submitted a "Statement of Material Facts Not in Dispute" given that he has not filed any cross-

motion for summary judgment, and therefore the Court should disregard that improper statement. (*Id.* at 10-11.)

Second, Defendant argues that it is entitled to summary judgment for the following reasons: (a) the fact that the record contains documentation that a fax related to the final blood culture results was sent from GHED does not substantiate or even create a genuine dispute of material fact that such fax, let alone the results, were actually received by CHCNC, and, in any event, receipt of the results is insufficient to show that CHCNC breached the applicable standard of care; (b) Plaintiff's arguments ignore the fact that Dr. Charash's opinions are outside the scope of his area of expertise; and (3) Plaintiff's motion does not show the existence of a genuine dispute of material fact and fails to reconcile aspects of Dr. Charash's testimony that are, in fact, consistent with Dr. Hostetler's testimony as well as aspects of Dr. Charash's opinions that are inconsistent with his own deposition testimony. (*Id.* at 11-18.)

Third, Defendant argues that Plaintiff's motion to preclude Dr. Hostetler's opinions should be denied as untimely because (a) it was filed after the date set by the Court's Uniform Pretrial Scheduling Order and subsequent extensions of the deadlines contained therein, (b) Plaintiff never sought a modification of the Scheduling Order or that specific deadline related to his motion, and (c) Plaintiff cannot demonstrate good cause for failing to comply with the deadline because all expert disclosures and depositions were completed before the relevant deadline for those and therefore Plaintiff had a full and fair opportunity to raise his challenges to Dr. Hostetler's opinion in a timely manner. (*Id.* at 18-22.)

Fourth, Defendant argues that, should the Court consider Plaintiff's motion to preclude Dr. Hostetler's opinions, it should find that he is qualified to provide those opinions. (*Id.* at 23-

27.) Specifically, Defendant argues that it does not matter that Dr. Hostetler is neither a hospitalist nor a primary care physician because, as an infectious disease specialist, he has the appropriate knowledge to render opinions regarding the recognition, management, protocol of treatment, and potential effects of a streptococcus sanguinis infection. (*Id.*)

## II. LEGAL STANDARDS GOVERNING A MOTION FOR SUMMARY JUDGMENT

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[16] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ.

---

16 As a result, "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

P. 56(a), (c), (e).[17]

Implied in the above-stated burden-shifting standard is the fact that, where a non-movant willfully fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.

Of course, when a non-movant willfully fails to respond to a motion for summary judgment, "[t]he fact that there has been no [such] response . . . does not . . . [by itself] mean that the motion is to be granted automatically." *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996). Rather, as indicated above, the Court must assure itself that, based on the undisputed material facts, the law indeed warrants judgment for the movant. *Champion*, 76 F.3d at 486; *Allen v. Comprehensive Analytical Group, Inc.*, 140 F. Supp.2d 229, 232 (N.D.N.Y. 2001) (Scullin, C.J.).. What the non-movant's failure to respond to the motion does is lighten the movant's burden.

For these reasons, this Court has often enforced Local Rule 56.1 by deeming facts set forth in a movant's statement of material facts to be admitted, where (1) those facts are supported by evidence in the record, and (2) the non-movant has willfully failed to properly respond to that statement.

Similarly, in this District, where a non-movant has willfully failed to respond to a movant's properly filed and facially meritorious memorandum of law, the non-movant is deemed to have "consented" to the legal arguments contained in that memorandum of law under Local

[17] Among other things, Local Rule 56.1(b) requires that the non-movant file a response to the movant's Statement of Material Facts, which admits or denies each of the movant's factual assertions in matching number paragraphs, and supports any denials with a specific citation to the record where the factual issue arises. N.D.N.Y. L. R. 56.1(b).

Rule 7.1(a)(3).[18] Stated another way, when a non-movant fails to oppose a legal argument asserted by a movant, the movant may succeed on the argument by showing that the argument possess facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(a)(3) ("Where a properly filed motion is unopposed and the Court determined that the moving party has met its burden to demonstrate entitlement to the relief requested therein . . . ."); *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1, n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (collecting cases); *Este-Green v. Astrue*, 09-CV-0722, 2009 WL 2473509, at *2 & n.3 (N.D.N.Y. Aug. 7, 2009) (Suddaby, J.) (collecting cases).

## III. ANALYSIS

### A. Whether Plaintiff's Motion to Exclude Defendant's Expert Was Timely Filed

After careful consideration, the Court answers the above question in the negative for the reasons stated in Defendant's reply memorandum of law. *See, supra,* Part I.C.3 of this Decision and Order. To those reasons, the Court adds the following analysis.

Defendant argues that the Court should strike Plaintiff's motion to exclude its expert witness because it was not timely filed according to the Court's scheduling order and subsequent rulings. The original scheduling order in this action (dated May 25, 2023) indicates that "[m]otions to preclude expert witness testimony must be filed and served on or before the motion

[18] *See, e.g.*, *Beers v. GMC*, 97-CV-0482, 1999 U.S. Dist. LEXIS 12285, at *27-31 (N.D.N.Y. March 17, 1999) (McCurn, J.) (deeming plaintiff's failure, in his opposition papers, to oppose several arguments by defendants in their motion for summary judgment as consent by plaintiff to the granting of summary judgment for defendants with regard to the claims that the arguments regarded, under Local Rule 7.1[b][3]; *Devito v. Smithkline Beecham Corp.*, 02-CV-0745, 2004 WL 3691343, at *3 (N.D.N.Y. Nov. 29, 2004) (McCurn, J.) (deeming plaintiff's failure to respond to "aspect" of defendant's motion to exclude expert testimony as "a concession by plaintiff that the court should exclude [the expert's] testimony" on that ground).

deadline as set forth in Paragraph (8) below." (Dkt. No. 18, at 2.) The referenced paragraph indicates that all motions other than those related to venue and jurisdiction must be filed by June 24, 2024, although that date was later extended through orders of the Court to a final date of April 17, 2026. (Dkt. No. 18, at 2; Dkt. No. 39.) Thus, pursuant to the terms of the Court's scheduling order, Plaintiff was required to file his motion to preclude Defendant's expert on or before April 17, 2026.

However, as Defendant highlights, Plaintiff did not file any such motion until June 8, 2026, when he submitted it as a "cross-motion" combined with his response to Defendant's motion for summary judgment. As an initial matter, Plaintiff's motion is not properly construed as a cross-motion. Pursuant to the Court's Local Rules, a "cross-motion" is "a request for relief that competes with the relief requested by another party against the cross-moving party." L.R. 7.1(c). Here, Defendant made no arguments seeking any sort of relief regarding Dr. Hostetler's opinions and testimony, mentioning it only to briefly to support its argument that Dr. Charash's opinions are unreliable and that summary judgment is warranted based on Dr. Hostetler's opinions regarding the applicable standard of care.[19] But the mere fact that portions of Defendant's argument regarding why Dr. Charash's opinions should be excluded are based on Dr. Hostetler's opinions does not mean that the relief Plaintiff seeks in his motion (i.e., exclusion of Dr. Hostetler's opinions) competes with the relief sought in Defendant's motion (i.e., exclusion of Dr. Charash's opinions and summary judgment). As a result, Plaintiff's motion is not subject to the provisions of Local Rule 7.1(c) that permit cross-motions to be filed jointly

[19] Notably, Defendant first argues that summary judgment would be warranted if Dr. Charash's opinions were excluded, whether or not the Court considers Dr. Hostetler's opinions, because New York law requires a plaintiff to proffer expert testimony to sustain any claim of medical malpractice. (Dkt. No. 40, Attach. 1, at 23-24.)

with the opposition brief, but is instead subject to the deadlines governed by the Court's Uniform Scheduling Order and subsequent extensions of time.

Pursuant to Local Rule 16.1(f), "[t]he Court shall strictly enforce any deadlines that it establishes in any case management order, and the Court shall not modify these deadlines, even upon stipulation of the parties, except upon a showing of good cause." L.R. 16.1(f). Further, "[a]ny request to extend deadlines contained in the Court's scheduling orders must be made before the deadline expires," in addition to meeting a number of other requirements, including the showing of good cause. *Id.* Here, Plaintiff has not made any request to extend the motion deadline of April 17, 2026, that was set by the Court, and, as that date has long since passed (and had already passed by the date he filed the relevant motion) he cannot meet the conditions for making any such request now. Nor has there been any showing of good cause for why Plaintiff chose to wait to file his motion in conjunction with his response to Defendant's motion rather than filing it by the specified deadline. Because Plaintiff filed his motion late without good cause, the Court finds that it should be denied as untimely.

Nevertheless, even if the Court were to consider that motion on its merits, it would deny Plaintiff's request to exclude Dr. Hostetler's opinion. Dr. Hostetler, as a board certified internal medicine physician with a subspecialty in infectious diseases and experience and knowledge relating to the management and treatment of positive blood cultures, is qualified to render opinions in this case, regardless of whether he specifically practices in a primary care setting. Further, Plaintiff's arguments as to why Dr. Hostetler is unqualified and/or his opinions lack a proper foundation or sufficient reliability go toward the weight to which his opinions might be

entitled rather than their admissibility.[20] *See Guerrero v. Loiacono*, 769 F. Supp. 3d 158, 167-68 (E.D.N.Y. 2024) (noting that Fed. R. Civ. P. 702 "embodies a liberal standard of admissibility for expert opinions," and "gaps or inconsistencies in the reasoning leading to the expert's opinion [generally] go to the weight of the evidence, not to its admissibility") (quoting *Restivo v. Hessemann*, 846 F.3d 547, 577 [2d Cir. 2017]); *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 306 (S.D.N.Y. 2015) ("Unless the information or assumptions that plaintiff's expert [] relied on were so unrealistic and contradictory as to suggest bad faith, inaccuracies in the underlying assumptions or facts do not generally render an expert's testimony inadmissible.") (internal quotation marks omitted); *M.B. ex rel. Scott v. CSX Transp., Inc.*, 130 F. Supp. 3d 654, 665 (N.D.N.Y. 2015) (Suddaby, J.) (noting that gaps or inconsistencies in an expert's reasoning, arguments that an expert's conclusions are wrong, disputes about the nature and strength of the expert's credentials, the expert's use or application of a methodology, or the existence or number of supporting authorities all go to the weight rather than the admissibility of the expert's testimony).

For the above reasons, the Court denies Plaintiff's motion to exclude the opinions and testimony of Dr. Hostetler.

### B. Whether Dr. Charash's Expert Opinion and Testimony Meets the Requirements of Fed. R. Civ. P. 702

---

[20] Notably, although Plaintiff argues that the fact that Dr. Hostetler devotes much of his expert report discussing his opinions that GHED breached the standard of care indicates that his opinions will not assist a factfinder in assessing whether CHCNC breached the standard of care, his opinion can be reasonably read as indicating (as supported by his deposition testimony) that there is no standard of care applicable to CHCNC at all because it was solely the duty of GHED to manage and treat that infection under the circumstances. An opinion that a defendant is not subject to any duty to treat or standard of care is an opinion that is relevant to a factfinder's determination because, if accepted, it would mean that CHCNC could not be held liable on the medical malpractice claim.

After careful consideration, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. *See, supra,* Part I.C.2 of this Decision and Order. To those reasons, the Court adds the following analysis.

As an initial matter, because the events underlying Plaintiff's claim in this case all occurred in New York State, New York law applies here; neither of the parties has argued otherwise. "A medical malpractice claim under New York law requires that a plaintiff establish '(1) that the defendant breached the standard of care in the community, and (2) that the breach proximately caused plaintiff's injuries.'" *Lind v. United States*, 20-CV-0574, 2024 WL 1345339, at *4 (N.D.N.Y. Mar. 29, 2024) (Nardacci, J.) (quoting *Arkin v. Gittleson*, 32 F.3d 658, 664 [2d Cir. 1994]). Additionally, "'New York law further provides that, except as to matters within the ordinary experience and knowledge of laymen, … expert medical opinion evidence is required to make out both of these elements.'" *Balman v. United States of America*, 825 F. Supp. 3d 73, 100 (N.D.N.Y. 2026) (Brindisi, J.) (quoting *Milano by Milano v. Freed*, 64 F.3d 91, 95 [2d Cir. 1995]). This means that, apart from "the 'rare' case where breach is 'so clear and obvious that it will be within the understanding of the ordinary layman,'" or where the defendant has proffered "any evidence to support the view that a proper standard of care was followed," a plaintiff is required to submit expert evidence to support his or her medical malpractice claim. *John-Cedeno v. New York City Health +Hosps. Corp.*, 22-CV-7959, 2025 WL 2432047, at *3 (E.D.N.Y. Aug. 22, 2025) (quoting *Sitts v. United States*, 811 F.2d 736, 740 [2d Cir. 1987]).

Plaintiff has submitted reports by an expert witness, Dr. Charash, in support of his claim in this case. However, Defendant argues that his opinions should be precluded for a number of reasons. As to the first of these reasons, Defendant argues that Dr. Charash is not qualified to

render opinions regarding the standard of care related to the diagnosis and management of bacteremia because infectious diseases are outside his specialty and experience.[21] (Dkt. No. 40, Attach. 1, at 16-20.) The Court is, however, unpersuaded by this argument.

"'To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony.'" *Miller-Harris v. Cnty. of Onondaga*, 808 F. Supp. 3d 386, 410 (N.D.N.Y. 2025) (Brindisi, J.) (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 40, [2d Cir. 2004]). Defendant focuses on the fact that Dr. Charash is board certified in cardiology and practices in that field, but appears to completely ignore the evidence showing that Dr. Charash is also board certified in internal medicine and also practices in the capacity of a primary care physician for approximately 50% of his private practice patients. (Dkt. No. 47, Attach. 9, at 15-16; Dkt. No. 47, Attach. 12, at 6, 10.) Dr. Charash further testified at his deposition that "infectious disease is a subspecialty of internal medicine" and that he is "an expert at certain degrees of infectious disease management, and I know when I need to call in help from a subspecialist." (Dkt. No. 47, Attach. 9, at 24.) Further, Dr. Charash understood his role as "talking about the responsibility of primary care providers in terms of their management of a person who has a positive—has growth in a blood culture," and he testified that, during his earlier career of being a "full-time hospital person," he treated "probably a hundreds [sic] of people with positive blood cultures" and in his private practice, he has had "one case a year or

---

[21] Defendant does not appear to argue that Dr. Charash lacks the qualifications to render opinions regarding whether bacteremia and endocarditis were causally related to Plaintiff's mitral valve regurgitation, or that, in the abstract, the failure to treat that infection resulted in the subsequent need for mitral valve replacement.

less," an estimated "10 to 15 people" that have required a blood culture to be taken. (*Id.* at 25, 49-50.) This experience is sufficient to render Dr. Charash qualified to opine regarding the standard of care applicable to a primary care physician related to the diagnosis and management of bacteremia.[22]

"Once a court determines that an expert is qualified to testify, 'Rule 702 imposes on the trial judge an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, i.e., will be not only relevant, but reliable.'" *Cayuga Nation by and through Cayuga Nation Council v. Parker*, 22-CV-0128, 2025 WL 3204503, at *1 (N.D.N.Y. Nov. 17, 2025) (Sannes, C.J.) (quoting *United States v. Romano*, 794 F.3d 317, 330 [2d Cir. 2015]). In determining whether the testimony is reliable, "[t]he court should ask whether (1) 'the testimony is grounded in sufficient facts or data; (2) … the testimony is the product of reliable principles and methods; and (3) … the witness has applied the principle and methods reliable to the facts of the case.'" *Parker*, 2025 WL 3204503, at *1 (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 265 [2d Cir. 2002]).

Defendant argues that Dr. Charash's opinions are unreliable because they are not supported by the evidence in the record. However, Defendant's arguments in this respect are premised on the theory of its own expert witness, Dr. Hostetler, that GHED, rather than CHCNC,

---

22 The Court also notes that, in response to Defendant's arguments that Dr. Charash stated he would not know how to specifically treat a strep sanguinis blood infection and would have to consult with an infectious disease specialist to do so, such testimony does not render him unqualified to offer the relevant opinions here. Dr. Charash's deposition testimony in particular suggests that a referral to another source more capable of monitoring and treating such an infection, such as an emergency room or an infectious disease specialist, would indeed comply with the standard of care for a primary care physician. As a result, the fact that Dr. Charash might not be an expert in personally treating such infections does not render him unqualified to opine on the standard of care applicable to a primary care physician confronted with a patient found to have such an infection.

had the duty to provide care for Plaintiff's bacteremia by virtue of being both an emergency medicine provider and the location where the blood cultures were ordered. (Dkt. No. 40, Attach. 1, at 20-21.) The fact that Dr. Charash disagrees with Dr. Hostetler regarding the standard of care that is applicable to CHCNC does not render his opinion unreliable. Dr. Charash did not ignore the fact that it was GHED that ordered the blood cultures, received the results, and provided limited treatment with oral Levaquin before discharging Plaintiff from the emergency room. Instead, he acknowledges these facts and opines that CHCNC still had a duty to stay apprised of Plaintiff's condition to ensure that GHED's treatment was adequately addressing his condition and provide some form of follow-up care – whether that was ordering updated blood cultures and treating Plaintiff itself, sending him back to the emergency room, or referring him to an infectious disease specialist. The issues that Defendant raises are therefore not matters relating to the reliability of Dr. Charash's opinions, but rather that go to the weight a factfinder should afford to those opinions.[23]

Defendant also oversimplifies matters in asserting that, because Dr. Charash acknowledges that blood infections like the one Plaintiff had often cannot be appropriately managed in an outpatient primary care setting, he and Dr. Hostetler have actually opined the same standard of care and therefore there is no conflicting expert testimony to prevent summary judgment. While Dr. Charash does indeed testify that bacteremia and endocarditis require specialized care or management in a hospital or by an infectious disease specialist, the standard

---

[23] In this way, this case is indeed similar to *Lind*, contrary to Defendant's argument. Notably, the Court in that case rejected the defendant's arguments that Dr. Charash's opinions were unreliable, noting that the defendant's arguments were based in part on its own expert's opinions and testimony, and therefore the real issue was which expert a factfinder should believe rather than whether Dr. Charash's opinion was admissible. *Lind*, 2024 WL 1345339, at *6.

of care that is contained within his opinions is unequivocally not the same as the standard of care opined by Dr. Hostetler. Dr. Hostelter essentially opines that there is no standard of care applicable to CHCNC as a primary care provider related to treatment of such an infection because the duty belongs to GHED, who ordered his blood cultures and had the resources to treat that infection. By contrast, Dr. Charash opines that a primary care physician such as CHCNC still has a duty to address the needs of its patients who present to them with a blood infection by either managing that care itself or referring them for appropriate care and management if CHCNC cannot itself provide that care and management. (*See* Dkt. No. 47, Attach. 12, at 11 [Dr. Charash stating in his expert report that "each provider is responsible for knowing what they know, and to know when they need to call in a consultant," and that "all such providers are expected to either proceed with the basic workup for this condition, or to refer a patient to a specialist to assume responsibility for that same workup.") These opinions are very clearly not expounding the same standard of care, and therefore a question exists that can only be resolved by a factfinder's consideration of those competing opinions.

Nor is the Court convinced by Defendant's arguments that Dr. Charash's opinion is materially inconsistent with his deposition testimony. Defendant's characterization of Dr. Charash's opinion as being that CHCNC was required to personally manage and treat Plaintiff's blood infection is not an accurate assessment of Dr. Charash's explicit statements in his expert reports (quoted previously) that CHCNC could have also met its duty by referring Plaintiff's care to a specialist if it was beyond their ability or capacity to treat personally at CHCNC. Such opinion is consistent with his deposition testimony. Additionally, even if inconsistencies do exist between Dr. Charash's expert report and his deposition, those would go to the consideration

of what weight should properly be afforded to his opinions, not their admissibility. *See Davids v. Novartis Pharms. Corp.*, 857 F. Supp. 2d 267, 279 (E.D.N.Y. 2012) ("To the extent Novartis argues that Dr. Kraut did not adequately rule out additional factors or has provided contradictory testimony in the various depositions, these are credibility determinations that go to the weight and not the admissibility of his opinions.").

For all of the above reasons, the Court denies Defendant's motion to exclude the opinions and testimony of Dr. Charash, and also denies Defendant's motion for summary judgment because of the existence of competing expert witness opinions and disputed issues of material fact including the extent to which NP Couperus-Mashewske in particular, but also CHCNC in general, had knowledge of the results of the blood cultures and actions taken by GHED to treat Plaintiff in January of 2020.

**ACCORDINGLY**, it is

**ORDERED** that Defendant's motions to exclude Dr. Charash's opinion and for summary judgment (Dkt. No. 40) are **DENIED**; and it is further

**ORDERED** that Plaintiff's motion to exclude Dr. Hostetler's opinion (Dkt. No. 47) is **DENIED**.

Dated: August 18, 2026
Syracuse, New York

Glenn T. Suddaby
U.S. District Judge